**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRUSTEES MAIN/270 LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-1938** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **APPLIANCESMART, INC., et al.,** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendants.** | : | |
| | : | |

**OPINION & ORDER**

Plaintiff Trustees Main/270 LLC ("Trustees Main") brought suit against Defendants ApplianceSmart, Inc. ("ApplianceSmart" or "Plaintiff") and JANONE, Inc. ("JANONE"), alleging claims for breach of lease and guaranty of lease. (ECF No. 1). On May 5, 2025, this Court held a bench trial to resolve the remaining issue: the extent of Defendants' liability as tempered by Plaintiff's duty to mitigate damages. Based on the findings of fact and conclusions of law stated below, this Court finds in favor of Plaintiff.

## I. PROCEDURAL HISTORY

Plaintiff filed its Complaint on April 11, 2022, seeking to resolve a landlord/tenant dispute regarding a lease agreement between landlord Trustees Main and tenants ApplianceSmart[1] and JANONE[2]. (ECF No. 1). The claims arise from ApplianceSmart's failure to pay pursuant to a lease agreement, and JANONE's obligations as guarantor under the lease. (*Id*.).

---

[1] JANONE owned ApplianceSmart until 2019 when it was sold to Live Ventures, a company run by JANONE's CEO's son, Jon Isaac. (ECF No. 92 at 122). An entity called ApplianceSmart Holdings was formed, and that entity bought ApplianceSmart. (ECF No. 92 at 148).

[2] Formerly Appliance Recycling Centers of America which abbreviates to ARCA. (ECF No. 92 at 148). Now renamed ALT5. (*Id*. at 122).

On July 17, 2023, Defendants filed a Motion for Partial Judgment on the Pleadings. (ECF No. 39). Defendants asserted that the contractual provision relied on by Plaintiff was inapplicable, and as a result, Plaintiff failed to state a claim. Plaintiff responded, arguing that even if the provision was inapplicable, its Complaint met the pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure. (ECF No. 43). In an Opinion & Order dated March 29, 2024, this Court found that Plaintiff sufficiently alleged the requisite elements of a breach of contract and adequately pleaded a cause of action. (ECF No. 59).

On February 12, 2024, Plaintiff filed a motion for partial summary judgment seeking damages against Defendants jointly and severally for $768,971.84; 18% interest per annum on the amounts owed; and attorney fees incurred in recovering these amounts to be determined upon final judgment in this matter.  (ECF No. 51). This Court found that the parties did not dispute that Defendants failed to pay rent, tenant charges, and late charges beginning from February 1, 2022 to March 26, 2023. (ECF No. 60). This Court also noted that Defendants admitted that it owed rent and tenant charges of $155,267.15 to Plaintiff as of June 1, 2022. As such, the motion for partial summary judgment was granted in part as to the $155,267.15, and this Court awarded Plaintiff accordingly. (ECF No. 60 at 5). The motion, however, was denied in part as to whether Plaintiff mitigated its damages. (ECF No. 60 at 9). This case was then scheduled for a bench trial.

Parties jointly filed a proposed pretrial order confirming that the remaining issue is whether Plaintiff met its obligations to mitigate Defendants' breach of their rent and other financial obligations under the lease. (ECF No. 83 at 3). At trial, Defendants called one witness, Tony Isaac, CEO of JANONE. (ECF No. 92 at 123). Plaintiff presented two witnesses: AJ Solomon, the senior vice president of leasing at Schottenstein Property Group; and Marlene Brisk, a lawyer in Schottenstein Property Group's Lease Administration Division. Schottenstein Property Group owns a

real estate company with most of its holdings in shopping centers, one of which is Trustees Main. (ECF No. 92 at 5-6).

## II. FINDINGS OF FACT

### A. The Lease Agreement

The lease agreement at issue is by and between the landlord Trustees Main, the tenant ApplianceSmart, and the guarantor JANONE. (P-8). Under the agreement, Trustees Main leased to ApplianceSmart the premises located at 6080 East Main Street, Columbus, Ohio ("Premises"). (*Id*. at 1). The agreement was signed initially on June 3, 2008, by and between Trustees Main's predecessor in interest, Schottenstein Trustees, and ApplianceSmart's predecessor in interest, ApplianceRecyling Centers of America ("Lease Agreement"). (P-1 at 000006, 000030-55). The agreement, later amended by the First Amendment to Lease Agreement, was set to expire on June 30, 2018. (*Id*. at 000018). On April 25, 2017, Trustees Main and ApplianceSmart (as the successor in interest) entered into a Lease Extension and Modification Agreement that extended the term through June 30, 2025. (*Id*. at 000018-25). In conjunction with the extended lease term, ApplianceRecyling Centers of America signed a guaranty of lease, in which it guaranteed that certain obligations of ApplicanceSmart would be met in the event of a default under the lease. (*Id*. at 000023). Section 22 of the Lease Agreement governs default:

(a) In the event the business being conducted in the Premises shall at any time be subsequently terminated, or if Tenant fails to operate in accordance with the provisions of this Lease or in the event Tenant shall be in default in the performance of any other of the terms, covenants, conditions or provisions herein contained . . . after Landlord has given Tenant thirty (30) days prior written notice of such non-performance . . . Tenant shall be deemed to be in default under the terms of this Lease . . . and Landlord may, in addition to all other remedies available at law or equity, exercise the remedies set forth in Section 23 hereof.

(b) In the event Landlord has failed to receive the payment of any installment of Rent, Tenant shall be deemed to be in default under the terms of this Lease, and Landlord may, in addition to all other remedies available at law or in equity, exercise the remedies set forth in Section 23 hereof. Notwithstanding the foregoing, Landlord shall give Tenant written notice of a monetary delinquency one (1) time per Lease Year and

3

Tenant shall have five (5) days thereafter to cure such monetary delinquency prior to such constituting a breach or default of this Lease.

(P-1 at 00044).

If default occurs, Trustees Main may elect to terminate the Lease Agreement pursuant to Section 23(a)(i) of the Lease Agreement:

(i) Without terminating Tenant's obligation to pay Rent, [Landlord may] elect to terminate the Lease and the tenancy created hereby by giving Notice to Tenant, which termination shall be effective as of the date of such Notice or any later date therein specified by Landlord in such Notice . . . and, without further Notice, Landlord shall have the right to repossess the Premises . . . .

(*Id*. at 000044-45). Section 23(a)(i)(1)-(5) further enumerates, without limitation, the categories of recoverable losses to which Plaintiff may be entitled as a result of the Lease Agreement termination. (*Id*. at Main 000045). This includes a calculation under Section 23(a)(i)(5) involving "the present value of the Rent (discounted at a rate of interest equal to eight percent (8%) per annum (the Discount Rate)) that would have accrued under this Lease for the Term, reduced by the present value of the actual Rent, discounted at the Discount Rate, received from Landlord's successful reletting of the Premises." (*Id*. at 000045). The Lease Agreement further provides under Section 23(b) that "If Landlord relets the Premises, either before or after the termination of this Lease . . . Tenant shall be given credit for all rents received." (*Id*. at 000046).

On the other hand, in the event of default Trustees Main may also elect to proceed with taking possession of the premises without terminating the lease. The Lease Agreement, under Section 23(a)(ii), states that Trustees Main may:

(ii) Elect to immediately, or at anytime (whereupon all obligations and liability of Landlord hereunder shall terminate) thereafter, and without terminating this Lease, enter into and upon the Premises or any part thereof and take absolute possession of the same, expel or remove Tenant and any other person or entity who may be occupying the Premises, remove any and all of their property from the Premises, and change the locks. Tenant covenants and agrees that notwithstanding any such re-entry by Landlord, it shall pay and be liable for . . . amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this Lease, become due if Landlord had not re-entered. . . .

4

> In the event of an Event of Default, Landlord shall not be deemed to have terminated this Lease (or the Term thereof) unless Landlord delivers a Notice to Tenant that expressly terminates this Lease.

(*Id*. at 000046).

Provided ApplianceSmart defaulted under the lease, Trustees Main agreed to, under Section 23(b), "take commercially reasonable efforts to relet the Premises" at the cost of ApplianceSmart. (*Id*.).

Moreover, Section 23(i) of the Lease Agreement states:

> Mitigation of Damages. If Landlord terminates this Lease or Tenant's right to possession, Landlord shall have the obligation to mitigate damages to the extent required by applicable law. If Landlord is required by applicable law to mitigate damages under this Lease: (1) Landlord shall be required only to use commercially reasonable efforts to mitigate, which shall not exceed such efforts as Landlord generally uses to lease other premises in the Shopping Center, (2) Landlord will not be deemed to have failed to mitigate and such mitigation shall be deemed complete if Landlord leases all portions of the Premises.

(*Id*. at 000048).

## B. ApplianceSmart Default

ApplianceSmart defaulted on their obligations under the lease three times. (ECF No. 92 at 49; 160; 161). First, in 2019, ApplianceSmart went into default for failure to pay rent. (*Id*. at 154). The same year, on September 27, 2019, the parties entered into a Second Lease Modification Agreement and Ratification of Guaranty by Converted Corporation ("Second Lease Modification"). (*Id*.; P-1 at 000006-12). The agreement recognized the conversion of the guarantor, Appliance Recycling Centers of America, to JANONE. (*Id*. at 000006). The agreement also required ApplianceSmart to pay $141,048.18 to Trustees Main as a partial payment of past due rent and tenant charges. (*Id*. at 270-000007). Then, in 2021, ApplianceSmart was in bankruptcy and again entered into default under the lease. (*Id*. at 157). On December 14, 2021, the parties entered into a Third Lease Modification Agreement and Ratification of Guaranty which required ApplianceSmart to pay $185,323.75 to Trustees Main as a payment of past due rent and tenant charges. (P-8 at 2). Additionally, JANONE's obligation as a guarantor was ratified and affirmed. As such, provided ApplianceSmart entered into

default under the lease, JANONE agreed to "pay or perform the Tenant Obligations in default, as applicable." (*Id*. at 3).

On February 10, 2022, Marlene B. Brisk of Schottenstein Property Group sent ApplianceSmart and JANONE a Notice of Default. The notice indicated that rent was past due and, in accordance with Section 22(b) of the Lease Agreement, the notice served as a five-day notice of delinquency. (P-1 at 270-001172). Brisk sent a supplemental notice on April 7, 2022, indicating that she learned that ApplianceSmart was no longer conducting business on the Premises. (*Id*. at 270-001174-75). The notice informed ApplianceSmart and JANONE that ApplianceSmart was thus also in default of its obligation to operate in accordance with the lease. (*Id*.). The notice also indicated that it was Brisk's intention to repossess the Premises unless ApplianceSmart or JANONE contacted Brisk by April 14, 2022. (*Id*.). The notice cautioned that the leasing department will make commercially reasonable efforts to find a new tenant for the Premises but it "does not in any way release Tenant or Guarantor from the financial obligations and attorney fees currently owing or that will become due during the remainder of the lease term." (*Id*.; ECF No. 92 at 70-71).

Brisk did not receive any claim by ApplianceSmart or JANONE that ApplainceSmart was not in default. (*Id*. at 71). Instead, ApplianceSmart remained in default and JANONE did not pay to remedy the default.[3] (ECF No. 92 at 75, 146). Indeed, this Court granted Plaintiff's motion for partial summary judgment as to the unpaid rent and tenant charges of $155,267.15; and Tony Isaac, CEO of JANONE, admitted payment was not made. (*Id*. at 146-47). He further conceded that he had no recollection of whether Brisk was contacted by April 14, 2022, to dispute the store's operational status. (*Id*. at 186).

---

[3] While payment was not made to cure the default, JANONE indeed offered to pay all of the arrears and continue as the guarantor moving forward when offering replacement tenant options as further discussed below.

### C. Replacement Tenant Options

Ms. Brisk testified to the lack of incentive for a landlord to defer finding a replacement tenant for a premises in a shopping center while the existing tenant has an obligation under the lease to pay rent. (*Id*. at 58). She emphasized that the shopping center needs activity, and tenants expect Trustees Main to have other tenants because traffic from one tenant is better for the others. (*Id*.). Plaintiff engaged in discussions with potential replacement tenants identified through its own efforts, while also communicating with Defendants regarding their proposed replacement tenants—including those willing to assume the existing lease. (*See e.g*., *id*. at 86).

#### 1. Replacement Tenants Identified by Plaintiff

AJ Solomon was involved in finding a tenant for the Premises after Trustees Main took possession of the Premises. (*Id*. at 6-7). He explained that once a space is available—regardless to whether there is a tenant in it—he would look for a new tenant to replace the existing tenant if that tenant is coming to the end of its term. (*Id*. at 7). Here, he began searching for a replacement tenant for ApplianceSmart in early 2022 when he was told ApplianceSmart was looking to vacate regardless of its rent status and how much term was left. (*Id*. at 8-9). Solomon used his typical process of identifying replacement tenants that may be looking in the area by working with brokers, working directly with retailers, and trying to generate interest in the available space. (*Id*. at 7). Solomon also explained that in terms of leasing a property, it is common for him to have a number of discussions or negotiations with a variety of tenants that never come to fruition because they would present a letter of intent to different properties and later select one property. Often after submitting a letter of intent, businesses would find a reason the space did not work or would find a separate space during negotiations. (*Id*. at 11). Solomon, however, does not always receive an explanation from potential tenants when they are no longer interested in a property. (*Id*. at 13). He testified that it could take between twelve months to three years to find a tenant for a space like the Premises. (*Id*. at 21-22).

7

Solomon had explored expressed interest from Sheetz, Northern Tool, Appliance Factory Mattress Kingdom, Gordon Foods, and AutoZone. (*Id*. at 9). In March 2022, AutoZone expressed interest and a letter of intent was executed on July 29, 2022. (P-2 at 000251-262, 000265-271). Also in March 2022, Appliance Factory inquired about the premises and Solomon worked on a letter of intent in May 2022. (*Id*. at 000274-279). Between October 2022 and November 2022, Solomon communicated with a broker for Northern Tool discussing their interest in the Premises. Solomon quoted rent and net charges and sent a letter of intent. (*Id*. at 000161-81; ECF No. 92 at 11). On June 24, 2023, the deal was put on hold by Northern Tool. (P-2 at 000244). In October 2023, a letter of intent was provided by Sheetz, Inc. (P-3; ECF No. 92 at 13). The negotiations did not go beyond this letter, however, because the site did not work for Sheetz. (ECF No. 92 at 13). Similarly, a letter of intent dated October 13, 2023 indicated that Gordon Food Services was interested in the Premises. (P-5 at 000369). Solomon explained that Gordon Food Services learned soon after the letter was submitted that the site also did not work for them, so there was no further discussion. (ECF No. 92 at 15).

One business—AutoZone—returned to the negotiations which, to Solomon, was more atypical. (*Id*. at 14). On July 23, 2023, Solomon received an email from a broker indicating that AutoZone was on site, had a positive reaction to the site, and was reviewing the letter of intent from the prior year. (P-2 at 000286). There was an extended period of due diligence as there were governmental issues and other AutoZone-specific requirements involved. (ECF No. 92 at 15; P-6). Ultimately, on September 26, 2024, a lease was signed with AutoZone. (ECF No. 92 at 16; P-4). Mr. Solomon testified that the process used to lease and market the Premises was no different from the process for leasing similar spaces owned by Schottenstein Property Group. (ECF No. 92 at 20). He further asserted that the process used to reach a lease agreement with AutoZone was no different from the efforts made for the other properties within the subject shopping center. (*Id*.)

8

### 2. *Replacement Tenants Proposed by Defendants*

As a guarantor, Mr. Isaac felt obligated to honor the lease when the tenant went in default and was willing to fulfill the obligations by paying the arrears and future rent. (ECF No. 92 at 177). ApplianceSmart and JANONE proposed three companies as replacement tenants for the premises: ARCA Recycling, Inc. ("ARCA"), Flooring Liquidators, and Vintage Stock. (ECF No. 92 at 25-26). Generally, once a deal with a replacement tenant progresses to a certain point, the information would be taken to the ownership of Schottenstein Property Group to get their approval for that tenant to take over that space. (ECF No. 92 at 26). None of the companies proposed by Defendants made it to that point. (*Id*.).

### a. *ARCA Recycling, Inc.*

First, on June 23, 2022, Defendants proposed ARCA as a replacement tenant. (*Id*. at 77; P-10). The ARCA proposal would have involved an assumption of the existing lease. (ECF No. 92 at 55). JANONE offered to pay all of the arrears and continue as the guarantor. (*Id*. at 129; P-10). Mr. Issac testified that ARCA could have moved in "very fast" and would pay rent immediately. (ECF No. 92 at 136). ARCA, like ApplianceSmart, was owned by JANONE. (ECF No. 92 at 72). Ms. Brisk noticed this relationship and, when forming a response, she explained that Plaintiff:

> [W]as trying to address the fact that . . . we had an entity which may be slightly different but was essentially related. We weren't quite sure how to unravel some of the internal entities. It seemed to be all the same principals. But we had them doing business as ApplianceSmart which was the same "doing business as" that we had already had to settle with after they walked away three times wanting to move back in for a fourth time. So that was a concern. The concern was that also it had taken a great deal of litigation and legal costs to get things resolved every other time, and where was that going to leave me if I handed the keys back over again.

(*Id*. at 45-46). She testified that she would have presented the opportunity to the "businesspeople" if she felt that Plaintiff was protected sufficiently in terms of damages. (*Id*. at 85). She did not want "to take effectively the same people who had walked away three times before and hand them the keys a fourth time without some sort of protection." (*Id*.).

On July 19, 2022, in response to JANONE, Inc.'s ARCA proposal, Trustees Main proposed certain conditions for ARCA's operation on the Premises. (P-11). The conditions included: (1) payment of all back rent, legal fees and related charges; (2); an early termination deposit equivalent to six months' rent and associated charges to be held in escrow until lease agreement is terminated; and (3) an extension of Trustees Main's 30-day termination right to 90-days. (*Id*.). The early termination deposit would be treated as liquidated damages in the event that the new tenant defaulted. (*Id*.). Moreover, if the tenant was current on all rent and not in breach of any of its lease obligations when said notice is given within six months or less of the expiration date of the lease, then that early termination deposit would apply to cover any remaining amount of rent that would be due. (*Id*.; ECF No. 92 at 81). Otherwise, if notice of termination is given prior to six months before the expiration of the lease, then the full amount of the deposit would be surrendered. (P-11; ECF No. 92 at 81). These conditions could result in ARCA occupying the Premises one day and on the same day receiving a 90-day notice of termination, thereby forfeiting the six months' deposit. (ECF No. 92 at 81). In this hypothetical, ARCA would be obligated to pay about $400,000 to occupy the space for only three months. (*Id*. at 82-83). Nonetheless, this amount includes over $200,000 necessary for paying the past due amounts. (*Id*.).

The proposed conditions were intended to assuage concerns stemming from the three prior instances of default.  Ms. Brisk reasoned that there was typically about six months' worth of rent and damages involved each of the three times ApplianceSmart defaulted. Ms. Brisk testified that these conditions were "an opportunity to say, if they walk away again, we probably will lose because we'll have the same business leaving and leaving all our other tenants with this empty space out of nowhere and us having to pursue and whatever else it takes; but at least we'd have sitting in escrow with our attorney some rent to get us, you know, a little more whole." (ECF No. 92 at 48).

Following Plaintiff's proposed conditions for treating ARCA as a replacement tenant, counsel for the Plaintiff made additional efforts to seek a substantive response from Defendants. Plaintiff

followed up with counsel for the Defendants on July 21, 2022, August 1, 2022, August 10, 2022, and August 16, 2022. (P-11; P-12; ECF No. 92 at 173-176). On August 23, 2022, counsel for the Defendants conveyed that Defendants had reviewed the proposal and remained willing and prepared to reoccupy and operate within the premises, committing to pay rent on a prospective basis as a means of mitigating losses while Plaintiff seeks a replacement tenant. They declined the other terms outlined in the proposal. (P-27).

### b. *Flooring Liquidators*

The second tenant proposal was submitted on March 23, 2023, wherein Defendants proposed that Flooring Liquidators serve as the tenant, with Live Ventures acting as guarantor. (D-9). This was only after Plaintiff's counsel sent correspondence on January 30, 2023, February 23, 2023, and March 9, 2023, to Defendants requesting information about any potential new proposed tenant. (P-16; P-17). Rather than continuing communication between the parties' counsel, Mr. Isaac emailed Ms. Brisk on March 23, 2023, that "JANONE's position is that by your unreasonable demands (changing the rules of the game in the middle of the game)" the guarantee was rendered "null and void." (D-9). He further warned that if "you DO NOT wish to lease with us to mitigate damages, that is fine, but your damages end here and we need to be released from all liabilities immediately." (*Id.*). He proposed allowing Flooring Liquidators, also owned by JANONE, to use the Premises and start paying rent on April 1, 2023. (D-9; ECF No. 92 at 96). Mr. Isaac explained that they are highly successful with 22 stores and he provided a link to the website. (D-9; ECF No. 92 at 95). This proposal was sent directly to Ms. Brisk, who responded that it would be best if, moving forward, parties communicate through their attorneys. (D-10). On April 25, 2023, and May 4, 2023, Defendant's counsel requested a business call with Plaintiff to discuss the Flooring Liquidators proposal. (D-11).

On May 4, 2023, Plaintiff's counsel responded to Defendants' request to discuss Flooring Liquidators as a prospective replacement tenant, advising that Plaintiff had reviewed the submitted information but had preliminary inquiries for Defendants. (D-11). Specifically, counsel requested

more information about the finances and the pending case against Live Ventures in *Securities and Exchange Commission v. Live Ventures Incorporated et al.*, Case No. 2:21-cv-01433, in the United States District Court, District of Nevada (Las Vegas). (D-11; P-24). He also raised a concern about the current guarantor, JANONE, which was also a defendant in the case. There was a "commonality of key decision-makers." (D-11). The CEO of JANONE was Mr. Isaac, who was a board member and strategic advisor for Live Ventures. The CEO of Live Ventures was Mr. Isaac's son. Plaintiff was concerned that JANONE failed to pay as a guarantor (before any offer for mitigation arose) and this failure to pay was "presumably a decision made by" JANONE's CEO. (*Id.*).

Defendants continued to request a business call to discuss Flooring Liquidators. On May 17, 2023, Defendants' counsel addressed Plaintiff's inquiries about the financials and Live Ventures. (P-20). Defendant's counsel argued that JANONE is no longer in default on its obligations because they offered to continue to pay rent through the ARCA proposal. Moreover, Flooring Liquidators was "ready, willing, and able, to occupy the Premises and pay immediately." (*Id.*). As such, Defendants' counsel argued that absent any evidence that Flooring Liquidators is an unfit tenant or financially unable to pay rent, Plaintiff had an obligation to accept the offer or run the risk of not meeting mitigation obligations. He also emphasized that JANONE and Live Ventures are separate corporations. (*Id.*).

Following receipt of responses to the preliminary inquiries, Plaintiff's counsel acknowledged the existence of ongoing disagreements about the parties' situation but nevertheless advanced the dialogue in anticipation of a business call to discuss further the proposed tenant. (P-21). Given Ms. Brisk's belief that the Flooring Liquidators proposal would involve a new lease, she posed questions for Floor Liquidators that did not arise for the ARCA proposal. (ECF No. 92 at 55). This was because Ms. Brisk's understanding was that the ARCA deal was not going to require a new lease and that they were not willing to sign a new lease. (*Id.* at 55). Ms. Brisk testified that she consulted with Mr. Solomon and Mark Ungar, Executive Vice President of Leasing, to determine the information necessary for

assessing Flooring Liquidators. (*Id.* at 50-51). On May 25, 2023, Plaintiff's counsel sent to Defendants'

counsel fourteen screening questions seeking the following information:

1.  the square footage of its average location;

2.  the square footage sought;

3.  the nature of the intended business, i.e. consumer retail/wholesale/distribution center;

4.  sales records for comparable locations for the past two years;

5.  the length of time the concept had been operating;

6.  whether a store prototype existed, and if so, plans for same;

7.  whether any locations were in existence outside of California and if so, if any are in the states bounding Ohio and/or potential sites on those states;

8.  where management would be located;

9.  the closest distribution center;

10. any current advertising in central Ohio or the surrounding trade area, and if none, information regarding budgeted and/or planned advertising;

11. the ownership structure of the entity signing the lease;

12. the projected one-year revenue for the entity signing the lease and the basis for the same;

13. a profit and loss statement and balance sheet for the past three years for the tenant signing the lease

14. indication as to whether Flooring Liquidators' interest in becoming a tenant is continued upon a compromise of the balance owed under the ApplianceSmart lease.

(P-21). Mr. Solomon confirmed that, when searching for tenants, he seeks information regarding the

tenant's financial data, plans and specifications, whether the tenant intends to make modifications to

the store, and any required permitting, and likelihood of commercial success. (ECF No. 92 at 23, 37,

51).

On June 19, 2023, Mr. Isaac, again contacting Ms. Brisk directly, expressed a "strong desire" to occupy the premises and explained that Flooring Liquidators has "stellar" financials and would like to see the Premises. (D-12; ECF No. 92 at 102-03). The next day, Plaintiff's counsel acknowledged Mr. Isaac's interest and noted that a response to the fourteen screening questions is needed before engaging in a substantive conversation about Flooring Liquidators. (P-22). Defendants' counsel, on July 12, 2023, requested a call with Ms. Brisk to discuss moving forward and on July 13, 2023, Plaintiff's counsel responded offering a conference call between the Defendants and Mr. Solomon while also reiterating the need for responses to the fourteen screening questions before a call is held. (P-23).

Defendants did not directly address the screening questions. (ECF No. 92 at 171). Mr. Isaac described the request for a response to the fourteen screening questions as "a tactic for delays in order to get the cake and eat it." (ECF No. 92 at 171). He testified that all the answers needed for a landlord to make a decision was provided through the link to the Flooring Liquidator's website and their financials on the SEC website. (*Id*.). He also, however, conceded that the floor plan details or advertising details—information sought in the fourteen screening questions—were not included on the website or in the financials. (*Id*.).

### c.    *Vintage Stock*

Mr. Isaac testified that parties spoke at length about Vintage Stock as a replacement tenant. (ECF No. 92 at 153). He explained that Defendants "were remedying the situation, paying the arrears, and taking over the space by a retailer who has 70 locations." (*Id*.). He also testified that he spoke with Ms. Brisk about Vintage Stock, as it was the only subsidiary that could take over the Premises. (*Id*.). Ms. Brisk had no recollection of discussing Vintage Stock and declared that she only heard the name during discovery in this case and has no records indicating otherwise. (*Id*. at 56).

No written documentation of the Vintage Stock proposal was identified by either party. (*Id*. at 153).

14

### D.  The Replacement Lease With AutoZone

A lease was signed with AutoZone on September 26, 2024, more than two years after the letter of intent was signed. (ECF No. 92 at 16; P-4; P-6). The lease is subject to a 180-day approval period where they have time to investigate and confirm that they are able to operate within the premises prior to committing fully to the deal. (ECF No. 92 at 17; P-4 at 000292). The lease also includes a 150-day period following the expiration of due diligence in order to get their permits and approvals. (ECF No. 92 at 17; P-4 at 000298). AutoZone was also offered five extension periods under the lease. (ECF No. 92 at 17; P-4 at 000292). Mr. Solomon testified that, based on the multiple periods provided under the lease, he does not anticipate rent will commence under the lease before June 2025. (ECF No. 92 at 18). Rather, he believes their construction period, which is believed to be 180 days, would begin in June or July. (*Id*.). Any rent payments would commence following these periods. (ECF No. 92 at 19). Even so, AutoZone has access to the Premises for permits and approvals. (*Id*. at 31).

### E.  Evidence of Damages

Plaintiff offered testimony of damages through Ms. Brisk. She explained the extensive file of documentation of the charges owed by the defendant under the lease. (P-25; ECF No. 92 at 66-68). As of May 1, 2025, excluding attorney fees, defendants owed $1,219,941.79 in rent and charges. (ECF No. 92 at 69). Additionally, broker fees associated with placing AutoZone, as testified by Mr. Solomon, amounted to $126,637.52. (*Id*.). This brings the total to $1,346,579.31.

### III.   CONCLUSIONS OF LAW

Generally, when a contract requires mitigation of damages and the offset of sums under a new lease, Ohio courts hold that the lease language controls the outcome of the case and the Plaintiff "must establish their entitlement to damages under a contract with reasonable certainty, and such damages may not be based on mere speculation or conjecture." *Chuang Dev. LLC v. Raina*, 2017-Ohio-3000, ¶ 74, 91 N.E.3d 230, 247.

As this Court explained in its Opinion and Order resolving the Motion for Partial Summary Judgment, the failure to mitigate damages is usually an affirmative defense. As such, the defendant typically bears the burden of proving that a landlord failed to mitigate its damages. *Shonac Corp. v. Maersk, Inc.*, 159 F. Supp. 2d 1020 (S.D. Ohio 2001). Nonetheless, the case *sub judice* involves the Lease Agreement which provides—specifically under Sections 23(b) and 23(i)—that Trustees Main has an obligation to mitigate damages and that credit must be given if the Premises is re-leased. (P-1 at 000045-46). In this situation, a plaintiff may instead bear the burden of proving its mitigation efforts in order to show damages. *See Jayashree 10 Rests., LLC v. DDR PTC Outparcel LLC*, 2016-Ohio-5498, ¶¶ 21-22 (Ct. App.) (finding that "no court can be reasonably certain what the damages are" without evidence of the plaintiff's mitigation efforts); *see also Chuang Dev. LLC*, 2017-Ohio-3000, ¶¶ 64-67, 91 N.E.3d at 245 (quoting *Jayashree*, 2016-Ohio-5498, ¶¶ 24-26 ("Because the lease in *Jayashree* required 'the lessor to establish the amount of any deficiency after re-let in order to recover for balance of the term of the lease,' the language of the 'lease control[led] the outcome.'")).

### A. Mitigation of Damages

#### 1. Efforts To Find A Replacement Tenant

As previously discussed, the Lease Agreement imposes upon Plaintiff a duty to mitigate damages. Section 23(i) of the Lease Agreement requires mitigation "to the extent required by applicable law" and it only requires "commercially reasonable efforts" not exceeding the efforts generally used by Trustees Main to lease other premises in the shopping center. (P-1 at 000048).

Moreover, it is well-established under Ohio law that a lessor, including under a commercial lease, has a duty to mitigate damages when a lessee abandons the leased premises prior to the expiration of the lease term. *Frenchtown Square P'ship v. Lemstone, Inc.*, 2003-Ohio-3648, ¶ 21,

16

99 Ohio St. 3d 254, 259, 791 N.E.2d 417, 422; *see also Stern v. Taft,* 49 Ohio App.2d 405, 361 N.E.2d 279 (1976). "In commercial leases, '[l]andlords mitigate by attempting to rerent the property.'" *Chuang Dev. LLC*, 2017-Ohio-3000, ¶ 68, 91 N.E.3d at 246 (quoting *Dennis v. Morgan,* 89 Ohio St.3d 417, 419, 732 N.E.2d 391 (2000)). Even so, "[t]he duty to mitigate requires only reasonable efforts." *Frenchtown Square P'ship*, 2003-Ohio-3648, ¶ 19, 99 Ohio St. 3d at 259, 791 N.E.2d at 421. "A landlord is not required to use extraordinary efforts to find a new tenant or attempt the unreasonable or impracticable." *Cobblestone Square II Co. v. L & B Food Servs., Inc.,* 2011-Ohio-4817, ¶ 36; *see e.g., Luca v. Volunteers of Am.*, 9th Dist. No. 3756, 1985 WL 10731 (June 19, 1985) (finding a good faith effort to mitigate damages was made by the landlord placing a "for lease or rent" sign in the window of the building); *Chuang Dev. LLC*, 2017-Ohio-3000, ¶ 74, 91 N.E.3d at 247 (finding Plaintiff only "had to present evidence that it engaged in reasonable efforts to attempt to re-let the premises in order to satisfy its obligation in . . . the lease.").

Plaintiff presented evidence that Mr. Solomon was substantially engaged in efforts to identify a replacement tenant for the Premises. (ECF No. 92 at 6-7). He began searching for a replacement tenant in early 2022, soon after Defendants failed to pay rent and defaulted under the lease. (*Id*. at 7). He testified that he employed his usual method for locating replacement tenants, noting that this process ordinarily requires twelve months to three years to complete. (*Id*. at 7, 21-22). Indeed, Solomon's efforts are exemplified by the various executed letters of intent. In 2022, letters of intent were submitted by Appliance Factory (P-2 at 000274-279), AutoZone (*Id*. at 000251-262, 000265-271), and Northern Tool (*Id*. at 000244). With respect to Northern Tool, Plaintiff provided communications detailing negotiations from October 2022 to June 2023. (*Id*. at 000161-81, 000244). In October 2023, letters of intent were exchanged by Plaintiff with Sheetz (P-3) and Gordon Food Services (P-5). Also in 2023, AutoZone reaffirmed its interest and reentered negotiations, engaging in extensive discussions from July 2023 until a lease was ultimately executed in September 2024.

17

(P-4). This evidence demonstrates a consistent effort to engage with potential tenants, negotiate lease terms, and secure a replacement tenant from 2022 until 2024. Taken together, these ongoing efforts demonstrate that Plaintiff met its duty to mitigate damages through commercially reasonable means.

Defendants failed to offer sufficient evidence challenging the adequacy of Plaintiff's independent efforts to secure a replacement tenant. Instead, Defendants adamantly asserted that Plaintiff failed to mitigate by "cherry-picking" a new tenant. (ECF No. 94 ¶¶ 56, 59). Mr. Isaac reasoned that Plaintiff wanted to "have the cake and eat it." (ECF No. 92 at 130, 169, 171, 182). In other words, Plaintiff wanted to lease the space to AutoZone and simultaneously hold Defendants liable for rent. (ECF No. 92 at 130, 135, 143, 169-171, 182-183). With respect to this issue, Mr. Solomon confirmed that a national retailer like AutoZone was a more valuable tenant for the Premises than a nonnational tenant. (ECF No. 92 at 29). In a similar vein, Ms. Brisk conceded that "from the landlord's perspective" Plaintiff was "better off waiting for a tenant like AutoZone rather than ARCA Recycling." (*Id*. at 88). She further acknowledged that, had she agreed to allow ARCA to assume the Lease, she might have jeopardized the opportunity to secure AutoZone as a potential tenant. (*Id*.). This merely reflects that Plaintiff ultimately secured a tenant considered more favorable or advantageous, not that it engaged in "cherry-picking" when securing the AutoZone lease. This is especially apparent given the substantial evidence demonstrating Plaintiff's ongoing efforts to engage with various potential tenants—Northern Tool, Sheetz, Gordon Foods, and tenants proposed by Defendants—despite the knowledge of AutoZone's interest.

Plaintiff demonstrated its use of commercially reasonable efforts to secure a replacement tenant and mitigate damages. Notwithstanding, Defendants introduced further evidence to support their contention that Plaintiff was "cherry-picking" and did not fulfill its duty to mitigate damages—rejecting proposed tenants put forth by Defendants under allegedly unreasonable

conditions as it actively pursued negotiations with the AutoZone. (ECF No. 92 at 27-28, 86-87). As further addressed below, the evidentiary support for that contention is lacking.

### 2. *Failure to Accept Defendants' Proposed Replacement Tenants*

Defendants first proposed ARCA as a replacement tenant. (ECF No. 92 at 77; P-10). The proposal involved JANONE paying all of the arrears and continuing as the guarantor. (ECF No. 92 at 129; P-10). ARCA would move in "very fast" and pay rent. (ECF No. 92 at 136).  Plaintiff responded with conditions including payment of all legal fees and related charges, payment of six months rent which would be forfeited upon early termination of the lease, and a 90-day termination right. (P-11). Defendants maintain that the conditions were unreasonable and manifestly unfair. (ECF No. 93 ¶ 51). Conversely, Plaintiff urges that this Court find it was not unreasonable for Plaintiff to reject ARCA as a tenant and Defendants refused to make a counterproposal to the proposed conditions. (ECF No. 93 ¶ 81).

 While a lessor has a duty to mitigate, the lessor is not required "to accept just any available lessee." *Frenchtown Square P'ship*, 2003-Ohio-3648, ¶ 19, 99 Ohio St. 3d at 259, 791 N.E.2d at 421.  Nonetheless, a lessor fails to satisfy the duty to mitigate damages when the lessor unreasonably rejects bona fide offers to re-lease the premises vacated by a lessee. *Cobblestone Square II Co. v. L&B Food Servs.*, 2011-Ohio-4817, ¶ 37 (Ct. App.). The court in *Cobblestone Square II Co* found:

> If his testimony is believed, [the landlord] improperly hindered the leasing of the space by requiring the other company to pay the back rent owed by [the tenant] … The nonbreaching party does not have a right to be made whole as a condition precedent to its efforts in mitigating damages. To hold otherwise would defeat the concept of mitigation altogether.

*Id.* at 141.

Generally, Plaintiff does not have a right to be made whole before it mitigates its damages, but this "is predicated on the fact that the [proposed replacement tenant] intended to negotiate its

own lease for the empty space, rather than assume [the defendants'] lease." C*obblestone Square II Co.*, 2011-Ohio-4817, ¶ 41. Unlike the proposed replacement tenant in C*obblestone Square II Co.*, the evidence shows that ARCA was proposed to assume the lease under which ApplianceSmart defaulted. (ECF No. 92 at 55; ECF No. 94 ¶¶ 19, 23, 24, 50, 52, 53, 55, 57, 58, 62).  Ms. Brisk testified that her understanding was that the ARCA proposal "would have been the assumption of the same lease that was already there." (ECF No. 92 at 55). This Court finds the same based on Defendants' proposal to pay the past due rent owed under the lease, utilize the same guarantor, and occupy the space with the same signage. (*Id*. at 129, 135-136; P-10).

It was not unreasonable for Plaintiff to propose conditions on ARCA to address concerns arising from the three prior instances of default under the lease sought to be assumed. Ms. Brisk admitted that the Plaintiff wanted to be made whole for ApplianceSmart's breach before ARCA assumed the lease. (ECF No. 92 at 85). She further explained that she did not want to enter into an agreement with the same people who defaulted on the lease three times "without some sort of protection." (*Id*.). It is reasonable to propose certain safeguards and remedies in light of the parties' prior dealings under the same agreement.

As explained above, Plaintiff's duty to mitigate does not require an acceptance of any lease offer. *Frenchtown Square P'ship*, 2003-Ohio-3648, ¶ 19, 99 Ohio St. 3d at 259, 791 N.E.2d at 421. Defendants' ARCA proposal was to pay what was owed and continue under the lease that was defaulted on three times with a new company but the same guarantor. Plaintiff's proposed conditions in response may have resulted in the hypothetical of terminating the lease on day one and requiring ARCA to forfeit the deposit, thus paying about $400,000 to occupy the space for only three months. (ECF No. 92 at 81-83). As Plaintiff explains in its post-trial reply brief, this "would have benefited JANONE by eliminating its potential liability as guarantor for ApplianceSmart's potential liability of

up to approximately one million dollars in future rent in exchange for its wholly owned entity ARCA accepting a potential maximum exposure of losing a rent deposit . . . ." (ECF No. 98 at 3).

Accordingly, this Court does not deem the proposed conditions— arguably aimed at "making the plaintiff whole"—to be unreasonable such that they would constitute a failure by Plaintiff to mitigate damages.

Moreover, the evidence establishes that Plaintiff undertook reasonable efforts to negotiate with Defendants in an attempt to mitigate damages. With respect to the ARCA proposal, Plaintiff's counsel responded with the proposed conditions on July 19, 2022, and followed up seeking a substantive response on July 21, 2022, August 1, 2022, August 10, 2022, and August 16, 2022. (P-11; P-12; ECF No. 92 at 173-176). Similarly, turning to the Flooring Liquidators, Plaintiff's counsel sought information about the proposal on January 30, 2023, February 23, 2023, and March 9, 2023. (P-16; P-17). On March 23, 2023, Ms. Brisk received the proposal: Flooring Liquidators would serve as the tenant, with Live Ventures acting as guarantor. (D-9). After being asked to answer fourteen screening questions before participating in a business call, Defendants failed to continue to engage with Plaintiff about the proposal. Indeed, Defendants' counsel requested a business call to discuss Flooring Liquidators on April 25, 2023, May 4, 2023, May 17, 2023, and July 12, 2023. Plaintiff, however, made clear that parties may conduct a business call after the screening questions were answered. (P-23). These questions were not addressed by Defendants.

At trial, Mr. Isaac asserted that Plaintiff's actions, particularly the screening questions, were "a tactic for delays" that  allowed Plaintiff "to get the cake and eat it." (ECF No. 92 at 171). This contention is insufficient to demonstrate a failure by Plaintiff to fulfill its duty to mitigate damages. Plaintiff provided testimony that the questions were curated by their leasing team and the questions sought information regularly requested to assess new unknown tenants under new leases. (*Id*. at 23, 37, 50-51). Defendant provided no evidence to support that all questions were addressed, the screening questions were unreasonable, or that Defendants conveyed to Plaintiff that they thought the questions

were unreasonable. Based on these facts, Plaintiff's actions with respect to Flooring Liquidators were reasonable.

As to Vintage Stock, parties provided no written evidence of the Vintage Stock negotiations. (ECF No. 92 at 153). While Mr. Isaac testified that he spoke with Ms. Brisk about Vintage Stock as a replacement tenant (*Id*.), Ms. Brisk testified that she had not recollection of discussing Vintage Stock and no records indicating otherwise. (*Id*. at 56). As such, there is no sufficient evidence for this Court to find Plaintiff was unreasonable by not selecting Vintage Stock as a replacement tenant.

Plaintiff's failure to accept ARCA, Flooring Liquidators, or Vintage stock did not amount to a failure to mitigate damages. As such, this Court finds in favor of Plaintiff. The remaining issue to resolve is the amount of damages to award. Defendants only opposition to Plaintiff's damages evidence and calculation is based on Plaintiff's failure to account for the value of the lease with the replacement tenant. (ECF No. 94 ¶¶ 65-68, 70).

## B. Offset to Account For Replacement Tenant Lease

While Plaintiff did not accept a replacement tenant proposed by Defendants, Plaintiff successfully executed a lease with AutoZone on September 26, 2024. Defendants contend that, pursuant to Section (23)(a)(i)(5) of the Lease Agreement, the value of having AutoZone as a replacement tenant is relevant for calculating damages. (ECF No. 94 ¶ 60). Under the Lease Agreement, Plaintiff is entitled to recover for losses and damages caused by termination of the agreement including "the present value of the Rent (discounted at a rate of interest equal to eight percent (8%) per annum (the Discount Rate)) that would have accrued under this Lease for the Term, reduced by the present value of the actual Rent, discounted at the Discount Rate, received from Landlord's successful reletting of the Premises." (P-1 at 000045).

Defendants are not entitled to an offset of damages based on the value of the AutoZone Lease pursuant to Section (23)(a)(i)(5) because the Lease Agreement was not terminated. Neither

party offered any evidence to suggest otherwise.[4] Accordingly, the calculation outlined in Section (23)(a)(i)(5) is inapplicable in this case.

Similarly, Defendants are not entitled to any credit for rent received from the AutoZone lease because AutoZone did not pay any rent during the term of the Lease Agreement. Under Section 23(b) of the Lease Agreement, "[i]f Landlord relets the Premises, either before or after the termination of this Lease . . . Tenant shall be given credit for all rents received." (P-1 at 000046). Indeed, Plaintiff relet the premises. (P-4). Based on the AutoZone lease, there is a 180-day approval period (ECF No. 92 at 17; P-4 at 000292), a 150-day period for permits and approvals (ECF No. 92 at 17; P-4 at 000298), five extension periods (ECF No. 92 at 17; P-4 at 000292), and a 180-day construction period expected to begin in June or July (ECF No. 92 at 18). At trial, Mr. Solomon confirmed that rent had not commenced and was not anticipated to commence under the lease before June 2025. (*Id.*).

Because the bench trial concluded prior to the expiration of the Lease Agreement term, this Court ordered the parties to file a joint status report providing any relevant updates. (ECF No. 99). In their joint status report dated August 25, 2025, the parties confirmed that ApplianceSmart's lease expired on June 30, 2025, and that AutoZone's obligation to pay rent begins on the earlier of its opening for business or January 19, 2026. (ECF No. 100). As of the date of the status report, AutoZone had not yet commenced operations and, therefore, had not begun paying rent.

---

[4] Moreover, throughout this case, Defendants took the position that the section relied upon here, Section (23)(a)(i), does not apply because the lease was not terminated. For example, in the Motion for Judgment on the Pleadings, Defendant ApplianceSmart argued "Plaintiff cannot proceed under Section 23(a)(i) of the Lease, because it only applies in the event of a termination of the Lease by Plaintiff, and Plaintiff did not terminate the Lease." (ECF No. 39 at 1). Similarly, in its response to Plaintiff's Motin for Partial Summary Judgment, Defendants renewed their argument that Section 23(a)(i) does not apply because Plaintiff did not terminate the lease. (ECF No. 54 at 2).

As such, there is no evidence of any rent received that would trigger a credit under Section 23(b) of the Lease Agreement.

### C. Attorney's Fees

Plaintiff's requested relief includes payment of reasonable attorneys fees and costs. Under the Third Lease Modification Agreement and Ratification of Guaranty JANONE agreed to "pay or perform the Tenant Obligations in default, as applicable" and provides that JANONE "agrees to indemnify and hold Landlord harmless from any loss, liability, damage or expense (including reasonable attorney's fees) arising from the failure of Tenant to perform any of the Tenant Obligations and/or the enforcement of the Guaranty." (P-8 at 2). Defendants oppose Plaintiff's request for attorney's fees because Plaintiff did not offer any evidence of the amount of its attorney fees at trial. (ECF No. 94 ¶ 71). Indeed, the damages calculation excludes attorney's fees (ECF No. 93 ¶ 64) and the only relevant testimony was from Ms. Brisk stating that she had incurred attorney fees (ECF No. 92 at 76).

As Plaintiff explains in its Post-Trial Reply Brief, requests for attorney's fees may be addressed separately in a motion pursuant to Fed. R. Civ. P. 54(d)(2). Under Rule 54, "A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2).

### D. Interest

Plaintiff also requests interest pursuant to Ohio Rev. Code § 1343.03. "In diversity cases in this Circuit," such as the case here, "federal law controls post-judgment interest but state law governs awards of prejudgment interest." *Est. of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005) (quoting *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir.2000)). Accordingly, post-judgment interest is proper under 28 U.S.C. § 1961 and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year

constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. (sic) the date of the judgment." Per the most recent available information, the rate is 3.63%.[5]

Under Ohio Revised Code § 1343.03(A), Plaintiff is entitled to an award of pre-judgment interest accruing from the date the underlying obligation became "due and payable." The statute further provides that such interest shall be calculated "at the rate per annum determined pursuant to section 5703.47 of the Revised Code," unless a written contract between the parties specifies a different rate. In the absence of any contract provision identified by either party that would supersede the statutory rate, the applicable interest rate is governed by § 5703.47. Accordingly, this Court applies the following statutory rates: 3% for 2022; 5% for 2023; 8% for 2024; and 8% for 2025.[6]

## IV. CONCLUSION

As this Court previously found during Summary Judgment, there is no dispute regarding breach of lease and breach of guaranty, the remaining issue was the amount of damages in light of Plaintiff's duty to mitigate. (ECF Nos. 60; 83 at 3). For the foregoing reasons, this Court finds in favor of Plaintiff. Plaintiff is hereby **AWARDED** the following:

(1) $ 1,064,674.64[7] in rent and charges.

(2) $126,637.52 in broker fees as an expense compensable under the Third Lease Modification Agreement and Ratification of Guaranty.

(3) Pre-judgment interest under Ohio Revised Code § 1343.03(A) as explained above and applied to each monthly rent payment indicated as due within P-25.

---

[5] *Selected Interest Rates (Daily) – H.15*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h15/.

[6] *Annual Certified Interest Rates*, Ohio Department of Taxation, https://tax.ohio.gov/individual/resources/interest-rates.

[7] This does not include the amount previously awarded during summary judgment, $155,267.15.

(4) Post-judgment interest under 28 U.S.C. § 1961 as explained above, commencing as of the date

of this Judgment.

Any request for attorney fees may be brought in a motion pursuant to Fed. R. Civ. P. 54(d)(2).

**IT IS SO ORDERED**.

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  October 3, 2025**